OPINION
{¶ 1} Plaintiff-appellant Lynda J. Hapner appeals from a summary judgment rendered against her on her sex discrimination and wrongful termination claims against defendant-appellees Tuesday Morning, Incorporated, and Dee P. Burgess (collectively referred to as "TM" throughout this opinion). Hapner claims that her prima facie case of sex discrimination, coupled with evidence of pretext, precluded the trial court from granting summary judgment under Civ.R.56 and Reeves v.Sanderson Plumbing Prod., Inc. (2000), 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 2097. Additionally, she contends that her termination was a violation of public policy due to her employer's breach of Chapter 4112 and an implied covenant of good faith and fair dealing in employment matters.
 {¶ 2} We conclude that summary judgment was properly granted because Hapner failed to produce sufficient evidence from which a jury could conclude that she was the victim of sex discrimination under Chapter 4112. Moreover, we do not recognize a public policy of good faith and fair dealing as an exception to the Ohio at-will employment doctrine. Because Hapner, an employee-at-will, failed to establish any exception to the at-will rule, the trial court also did not err by granting summary judgment to TM on Hapner's claims of wrongful termination. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Hapner sued TM for sex discrimination and wrongful termination. She claimed that she was fired because of her gender. Alternatively, she alleged that TM wrongfully terminated her in violation of public policy. TM successfully moved for summary judgment.
 {¶ 4} Hapner began working as a store manager at TM in February, 2000. Her immediate supervisor was Burgess. TM disciplined Hapner several times during her tenure as manager. The first incident occurred in September, 2000, when she received a verbal warning for allegedly failing to handle a dispute between employees appropriately. She was next disciplined in October, 2000, when she failed to properly lock the store safe. TM eventually discharged Hapner in February, 2001, for "inadequate job performance," after two additional violations of store policy occurring in January and early February, 2001. The January event involved a failure to follow TM policies and procedures relating to inventory and process transfer, and the February incident related to Hapner's store's excessive use of dummy SKU numbers and inadequate customer service. The SKU system is a method of security that assigns a number to different types of merchandise to control losses and maintain accurate inventory. The customer service problem involved customers waiting almost an hour at a checkout.
 {¶ 5} TM filled Hapner's position with William Patrick Frick, manager of the Beavercreek store. Dustin Cope then took over Frick's manager position at his old store. Daniel Yohey was also promoted to assistant manager at Cope's store. Frick later left his employment with TM, after he had allowed employees to remove merchandise from the store without paying for it. Cope and Yohey were also disciplined and eventually allowed to resign instead of being fired for the same violation of TM policy.
 {¶ 6} The trial court rendered summary judgment in favor of TM, finding that Hapner was discharged due to "inadequate job performance," not because of her gender, and that the discharge was not a violation of public policy. From that judgment, Hapner appeals.
 II {¶ 7} Hapner's assignments of error are as follows:
 {¶ 8} "THE TRIAL COURT ERRED BY FAILING TO RULE ON THE SECOND PRONG OF HAPNER'S WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY CLAIM WHICH WAS BASED ON GOOD FAITH AND FAIR DEALING IN EMPLOYMENT RELATIONSHIPS"
 {¶ 9} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF-APPELLANT'S CLAIM OF SEX DISCRIMINATION"
 {¶ 10} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEES' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF-APPELLANT'S CLAIM OF WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY"
THE TRIAL COURT DID NOT ERR BY RENDERING SUMMARY JUDGMENT IN FAVOR OF TM ON HAPNER'S SEX DISCRIMINATION CLAIM.
 {¶ 11} We begin our analysis by addressing Hapner's contention, in her second and third assignments of error, that the trial court improperly rendered summary judgment in favor of TM on her sex discrimination claim. She alleges that the evidence presented creates a genuine issue of material fact whether TM's proffered reasons for her termination are a pretext. We review the appropriateness of summary judgment de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588, 641 N.E.2d 265. "Pursuant to Civ.R.56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." Zivich v.Mentor Soccer Club, Inc., 82 Ohio St.3d 367, 1998-Ohio-389, 696 N.E.2d 201
(internal citations omitted). Under Civ.R.56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record demonstrating that no genuine issue of material fact exists on the essential elements of the non-moving party's claims. Dresher v. Burt, 75 Ohio St.3d 280,1996-Ohio-107, 662 N.E.2d 264. Once the moving party meets that burden, the non-moving party has a reciprocal burden of showing that a genuine issue of material fact exists to prevent summary judgment. Id. If the non-moving party fails to meet this burden, then summary judgment is appropriate. With this standard in mind, we now address Hapner's assignments of error.
 {¶ 12} R.C. Chapter 4112 makes it unlawful for an employer to discriminate against any person because of her gender with respect to hire, tenure, terms, conditions or privileges of employment. Ohio courts rely upon federal case law construing Title VII to resolve gender discrimination claims brought under this Chapter. Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.
(1981), 66 Ohio St.2d 192, 421 N.E.2d 128.
 {¶ 13} The following test applies when determining whether an individual is the victim of gender discrimination:
 {¶ 14} "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant `to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretextfor discrimination. The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. The McDonell Douglas division of intermediate evidentiary burdens serves to bring the litigation and the court expeditiously and fairly to this ultimate question." Texas Dept. ofComm. Affairs v. Burdine (1981), 450 U.S. 248, 252-53, 101 S.Ct. 1089,1093-94, 67 L.Ed.2d 207 (internal citations omitted; emphasis added).
 {¶ 15} TM concedes that Hapner established a prima facie case of employment discrimination. Thus, the burden shifted to TM "to articulate some legitimate, nondiscriminatory reason" for Hapner's termination. Id.
"This burden is one of production not persuasion; it `can involve no credibility assessment.'" Id. TM met this burden by offering evidence that Hapner was terminated because of inadequate job performance, as evidenced by four corrective actions taken against her. Consequently, the controversy in this case centers around whether Hapner "prove[d] by a preponderance of the evidence that the legitimate reasons offered by [TM] were not its true reasons, but were a pretext for discrimination." TexasDept. of Comm. Affairs, supra (emphasis added).
 {¶ 16} Hapner claims that the four corrective actions demonstrating "inadequate job performance" were a pretext. She asserts that the action did not occur, that it could not have actually motivated her termination, or that it was insufficient to motivate her discharge. Hapner maintains that the real reason for her termination was TM's desire to replace her with a male manager.
 {¶ 17} Hapner supports this argument by relying upon certain language defining pretext found in Manzer v. Diamond Shamrock Chem. Co.
(6th Cir. 1994), 29 F.3d 1078, 1083-84 (internal citations omitted; emphasis in original):
 {¶ 18} "[O]nce the employer has come forward with a nondiscriminatory reason for firing the plaintiff, we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation * * *. To make a submissible case on the credibility of his employer's explanation, the plaintiff is `required to show by a preponderance of evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient
to motivate discharge * * *.' The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are `factually false.' The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff * * *. The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of circumstantial evidence of discrimination makes it `more likely than not' that the employer's explanation is a pretext, or coverup."
 {¶ 19} Hapner relies upon this definition and provides explanations for each of the four incidents leading up to her termination to demonstrate that each incident was a pretext. Before reviewing this evidence, we examine the continued vitality of Manzer's definition of pretext in light of the United State Supreme Court's opinion in Reeves, supra.
 {¶ 20} In that case, Reeves, a 57-year-old man, sued his employer, Sanderson Plumbing Company, for discharging him because of his age. At trial, the company put forth evidence that it discharged him because of his failure to maintain accurate employee attendance records. Reeves attempted to show that the company's reason was untrue by introducing evidence that he accurately recorded employee attendance and that his supervisor had demonstrated age-based animus against him in their dealings together. This evidence consisted of testimony by both Reeves and the company's witnesses that the time clock sometimes failed to record employee hours, and so managers, like Reeves, would make notations on an employee's time card that they reported to work on time. Additionally, Reeves showed that, on the day he was fired, the company told him that he was being terminated because he failed to report the absence of one employee. However, on the day of that employee's absence, Reeves was in the hospital. Reeves also presented evidence that his supervisor had made statements that Reeves "was so old [he] must have come over on the Mayflower" and that he "was too damn old to do [his] job." The company moved for a directed verdict, which the trial court denied. The appellate court reversed and entered a directed verdict on behalf of the company. On review, the Supreme Court held that Reeves' prima facie case, coupled with sufficient evidence of pretext, precluded a directed verdict for the company.
 {¶ 21} The Supreme Court, however, opined that:
 {¶ 22} "[A]n employer would be entitled to a judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only aweak issue of fact as to whether the employer's reason was untrue andthere was abundant and uncontroverted independent evidence that nodiscrimination had occurred * * *. To hold otherwise would be effectively to insulate an entire category of employment discrimination from review under Rule 50 [and, likewise, Rule 56], and we have reiterated that trial courts should not `treat discrimination differently from other ultimate questions of fact.'" Reeves, supra (emphasis added).
 {¶ 23} Based upon our reading of this case, we conclude thatManzer has been modified by Reeve's holding that only in "appropriate circumstances" may the trier of fact reasonably infer that a false explanation is a pretext, i.e., a cover-up for discrimination. Simply put, proof of pretext does not always constitute proof of intentional discrimination required for avoidance of a grant of a summary judgment or a directed verdict. With this guidance from the United States Supreme Court, we now examine Hapner's explanations to determine if she has created a genuine issue of material fact whether she was discharged because of inadequate job performance or whether she was discharged because of her gender.
 September 21, 2000, Corrective Action
{¶ 24} TM first disciplined Hapner for lack of communication skills. The corrective action form, which Hapner signed, states:
 {¶ 25} "Lynda and assit [sic] seem to lack communication skills. The gossip in this store needs to stop. Lynda needs to stop talking about her employees to other employees."
 {¶ 26} In her memorandum in opposition to TM's motion for summary judgment, Hapner claims that these events did not occur and that TM's use of this action as a basis for her termination is false — a pretext, in other words. To support this claim, she points to her deposition testimony:
 {¶ 27} "Q. [Attorney] Let me see if I can refresh your recollection. My understanding is that the events which triggered this or resulted in this verbal warning * * * had to do with a situation in which a third key named Galen Smith threw a set of rollers used to unload merchandise from the truck bed on to a floor at Priscilla Rash and cursed her. Does that Trigger [sic] any recollection?
 {¶ 28} "A. [Hapner] Yes. He didn't throw it at her, he threw them down. They rolled towards her and myself, because I was standing right next to her. He was taking the rollers down the aisle, and she said, in a very nasty tone, don't take them down that aisle. He got upset, threw the rollers down. They rolled towards her and myself.
 {¶ 29} "* * *
 {¶ 30} "Q. It's my further understanding that you called Francis Falls and asked her what, and told her that you didn't know what to do about this?
 {¶ 31} "A. No, I did not. Priscilla Rash called her.
 {¶ 32} "Q. Priscilla Rash called her?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. Do you know what Priscilla Rash told Francine Falls?
 {¶ 35} "A. No, I do not. I did not know she called until Francine called me back. I was in the back room talking to Galen about it, the situation.
 {¶ 36} "Q. At your request, did Francine Falls come to your store, 477?
 {¶ 37} "A. No, that was at Priscilla's request.
 {¶ 38} "Q. Do you know what the origin of this comment on [the September 21, 2000 corrective action form], Lynda needs to stop talking about her employees to other employees, is?
 {¶ 39} "A. I was talking to Galen and probably Trina, I am not really sure at this time."
 {¶ 40} When this evidence is viewed in a light most favorable to Hapner, we conclude that a genuine issue of fact exists whether this incident represents unnecessary gossiping on Hapner's part, or whether it was instead an attempt by Hapner to defuse a hostile situation. However, in view of Hapner's admission that she "probably" talked to Trina about the incident with Galen Smith, this is not a situation in which TM made up a false story as grounds for discharge. That a neutral factfinder might place a different construction on events does not render the construction placed on those events by TM so unreasonable as to amount to a pretext.
 October 5, 2000, Corrective Action
{¶ 41} TM next disciplined Hapner on October 5, 2000, for having failed to lock the store safe. The corrective action report issued to Hapner states:
 {¶ 42} "Upon entering the store at 12:00 noon I checked the safe and found it unlocked[,] the safe was closed, but unlocked. As manager it is Lyndas [sic] responsibility to oversee all policys [sic] and procedures.
 {¶ 43} "* * *
 {¶ 44} "Expectations[:] The safe must be locked at all times this is loss prevention and company policy."
 {¶ 45} As to this action, Hapner admits that the safe was not locked:
 {¶ 46} "Q. [Attorney] Okay. Is my information that in fact the safe was unlocked?
 {¶ 47} "A. [Hapner] Yes."
 {¶ 48} But Hapner argues that this action also was not a true basis for her termination, because she was never instructed that this was a violation of TM policy:
 {¶ 49} "Q. [Attorney] * * * Isn't it true that under the policies of Tuesday Morning, Inc., it was the manager's responsibility to make sure that the safe was locked?
 {¶ 50} "A. I have something to say about that. When I was in training, where I was trained, they did not lock their safe, they put it on day lock. And that's where I learned to put it on a day lock. Ordinarily I had it locked. But that day, someone asked for some money out of the safe. I gave them the money. A customer interrupted me, I just did the thing around, not the thing, but put the latch up so it was on a day lock."
 {¶ 51} Here, also, Hapner fails to create a genuine issue of material fact whether TM's reliance upon this action as a basis for termination amounted to a pretext. Although Hapner's motive for committing this infraction of TM's rules is disputed, she admits that it did occur. Even though she says other employees did the same thing, she points to no evidence that TM was aware of these violations but failed to discipline these employees, particularly members not in the protected class, for that conduct. She also does not argue that this type of behavior could motivate dismissal but did not. In fact, she does the opposite by setting forth evidence that it is not clear under TM's operations manual that this type of behavior is prohibited. Again, this is not a made-up allegation. Hapner did not lock the safe properly. Nor has Hapner offered any evidence tending to prove that TM insincerely offered this rules infraction as one of the grounds for her discharge.
 January 4, 2001, Corrective Action
{¶ 52} TM disciplined Hapner again in January, 2001, for inventory and transfer problems. Specifically, Hapner failed "to comply with Tuesday Morning procedures and policies [unreadable word] inventory. Product in trailer was not entered into inventory as was some product in stock room. Transfers not done properly. All transfers must be accepted and transmitted."
{¶ 53} Hapner admits that part of her inventory was not completed properly:
 {¶ 54} "She [Dee Burgess] called and told me that my inventory was really bad. And I go, well, I can't believe that. So then I got to thinking about the trailer. I asked Galen if he had counted it. He said no. I called Loss Prevention and told them that my back trailer was not counted."
 {¶ 55} Again, Hapner offers evidence concerning her motive for not properly completing the inventory, while admitting that the infraction occurred. She contends that an outside company was ultimately responsible for inventory and that Galen Smith, a male, not Hapner, committed the error leading up to this corrective action.
 {¶ 56} Once more, however, Hapner fails to create a genuine issue of material fact whether TM's reliance upon this action as a basis for termination amounted to a pretext. Even though Hapner disputes how this transgression occurred, she admits that an entire trailer of inventory at the store where she acted as manager was not counted.
 {¶ 57} She does put forth evidence that Frick, a male manager, experienced problems during the inventory process, but was not discharged. Specifically, she set forth this part of Frick's affidavit attached to TM's motion for summary judgment:
 {¶ 58} "The goods are transferred by register terminals and there is an opportunity for mistakes to occur. I believe that a goods transfer error was the explanation for what appeared to be the high shrinkage in the initial inventory of [my store]."
 {¶ 59} TM explained, however, that it was a culmination of events that led to Hapner's ultimate termination, not solely this particular infraction:
 {¶ 60} "Q. [Attorney] Of all the things that at least the paperwork show are the basis for the termination, was any one of them more supportive of the termination decision than the others?
 {¶ 61} "* * *
 {¶ 62} "A. [Burgess] Well, in fact, she could have been terminated the day I found the safe unlocked. That is grounds for immediate termination. So it was a cumulative accumulation of things.
 {¶ 63} "Q. So, in your mind, do all the things sort of weigh equally?
 {¶ 64} "A. Yes."
 {¶ 65} Even if one could reasonably infer mendacity on the part of TM from the fact that Hapner was written up for this infraction, while Frick was not, that inference is necessarily weak in view of the fact that we do not know the amount of shrinkage Frick's store experienced compared to Hapner's store. Consequently, we conclude that this creates at most a weak issue of fact whether the employer's proffered reason for the discharge was untrue, which was deemed insufficient in Reeves, supra.
 {¶ 66} Hapner has presented no other evidence tending to prove that illegal discrimination constituted TM's real reason for disciplining her for this action or for ultimately basing her discharge in part upon this infraction.
 {¶ 67} Hapner next contends that transfers were completed properly:
 {¶ 68} "Q. [Attorney]. So you contend that this, that the transfers were done properly?
 {¶ 69} "A. [Hapner]. Yes, sir."
 {¶ 70} Viewing this evidence in a light most favorable to Hapner, we conclude that a genuine issue of fact exists regarding whether transfers were completed properly. Again, however, we conclude that this evidence creates a weak issue of fact, at most, whether TM's proffered reason for her ultimate discharge was untrue, which was considered insufficient under Reeves, supra.
 February 6, 2001, Corrective Action {¶ 71} The corrective action form at issue here states:
 {¶ 72} "Excessive use of dummy SKUs affecting inventory results. Customers in line for 45 minutes on opening day because one register was open. Excessively high labor spent. Complete disregard of Tuesday Morning policies and procedures."
 {¶ 73} Hapner also disagrees with the basis for this corrective action:
 {¶ 74} "Q. [Attorney] First thing it says is, `Excessive use of dummy SKUs affecting inventory results.' Am I correct that an SKU is an inventory control number that is supposed to be on each item's price tag?
 {¶ 75} "A. [Hapner] Right, it's a security number.
 {¶ 76} "Q. Am I correct that in store, in your store, 477, there was both a paper compilation and also a computerized means of looking up the proper SKU numbers for any particular item?
 {¶ 77} "A. Yes, there is, but you have to know how they put it into the computer, how they named it in order to find it. And we would try to, but that took a lot of time, and customers, you have to make customers wait that time when you are trying to go through looking all that up in the computer. And you'd have to go to a different computer, you couldn't do that on your computer while ringing up people.
 {¶ 78} "* * *
 {¶ 79} "Q. * * * At any time while you were a manager * * *, either orally or in writing, were you advised that you should not use dummy SKUs unless absolutely necessary?
 {¶ 80} "A. I don't remember at this time.
 {¶ 81} "* * *
 {¶ 82} "Q. At any time while you were the manager * * * did either Dee Burgess or Francine Falls discuss with you trying to put accurate SKU numbers on items?
 {¶ 83} "A. * * * yes, we tried to do that."
 {¶ 84} Hapner once more fails to create a genuine issue of material fact regarding whether TM's reliance upon this action as a basis for termination was a pretext. Although Hapner's explanation why this infraction occurred is disputed, she admits that she did make use of SKUs. She does suggest that other managers were not disciplined for excessive use of SKUs, but she fails to put forth any evidence that other employees, particularly members not in the protected class, were not disciplined for similar conduct. Furthermore, she has put forth insufficient evidence tending to prove that illegal discrimination was TM's reasons for disciplining her for this action.
 {¶ 85} As to the contention that customers waited in line close to an hour on opening day, she testified as follows:
 {¶ 86} "She [Burgess] just said that she was told that one customer had to stand in line 45 minutes, and I told her that that was not true. I had registers open. We were very busy that day. I had Galen, he was helping customers. So that left one register to run at that time, and that was me, because everybody was helping customers.
 {¶ 87} "* * *
 {¶ 88} "Q. [Attorney] Did Dee Burgess, with regard to the customers waiting in line for 45 minutes on opening day, tell you that those customers could look through the open door of your office and see you eating lunch?
 {¶ 89} "A. [Hapner] No, that's not true, `cause I didn't eat lunch that day.
 {¶ 90} "Q. Were customers in line for 45 minutes on opening day?
 {¶ 91} "A. No, sir.
 {¶ 92} "Q. There was only one register open on opening day; is that correct?
 {¶ 93} "A. Yes. Well, at that time. The customer that she was referring to, at that time I only had one. I was the only one running a register. Everybody was helping customers. Which in my line of business, customers come first.
 {¶ 94} "Q. Do you remember for how long a time period on opening day there was only one register open?
 {¶ 95} "A. No, sir, I do not remember. They were being opened and closed, opened and closed."
 {¶ 96} Viewing this evidence in a light most favorable to Hapner, we conclude that a genuine issue of fact exists regarding whether customers waited in line for an extended period of time on opening day. Accordingly, we agree that use of this item on the action report may be evidence of pretext.
 {¶ 97} Hapner also contests the action report as it relates to high labor costs:
 {¶ 98} "Q. [Attorney] Another comment * * * `Excessively high labor spent.' Do you know what that means?
 {¶ 99} "A. [Hapner] Yes. That was during shutdown, we had to have people in doing the transfer and we had to have people unloading the semis, putting the merchandise out, so that's why, because we had to have people doing both things at the same time.
 {¶ 100} "Q. Did Dee Burgess or anyone else from Tuesday Morning, Inc. ever question you about high labor costs?
 {¶ 101} "A. No. No, they did not."
 {¶ 102} Again, viewing this evidence in a light most favorable to Hapner, we conclude that a genuine issue of fact exists regarding whether she committed this infraction. Thus, we agree that use of this item on the action report may constitute some evidence of pretext.
 {¶ 103} To further strengthen her contention that discrimination was the underlying basis for her termination, Hapner also contends there is additional evidence of mendacity on TM's part, because the company failed to follow its own policy when it waited several weeks to discipline Hapner for the January and February actions and then discharged her instead of counseling her.
 {¶ 104} TM replied with the presentation of Burgess' affidavit that provides as follows:
 {¶ 105} "The reason I did not come to [Hapner's] Store * * * and give Lynda Hapner the written counseling statement * * * in early January, 2001, is that during January 2001, I was heavily involved in relocating 5 different stores within my jurisdiction to different locations. I was relocating to different locations 2 stores in Cincinnati, 1 in Columbus and 2 in Cleveland, Ohio. Before I had a chance to come to Dayton to do the paperwork on the uncounted inventory and the transfer problems, several other serious performance deficiencies appeared which convinced me that it would be necessary to terminate the employment of Lynda Hapner."
 {¶ 106} Additionally, Hapner put forth evidence that a male manager and an assistant manager were allowed to resign, in lieu of termination, for more serious violations of TM policy. Specifically, Dustin Cope admitted that he also allowed employees to take merchandise out of the store without paying for it:
 {¶ 107} "Q. [Attorney] And during that meeting at the Beavercreek store * * * did Dustin Cope admit, in your presence, that he allowed employees to take merchandise home without paying for it?
 {¶ 108} "A. [Burgess] Yes, he did.
 {¶ 109} "Q. And during that same meeting, did Mr. Cope inform those present that he was simply doing what Mr. Frick had done when Mr. Frick was the store manager?
 {¶ 110} "A. Yes."
 {¶ 111} Hapner offered evidence that TM permitted Yohey, an assistant manager, to resign after admitting that he also allowed employees to remove merchandise from the store without paying for it:
 {¶ 112} "Q. [Attorney] Should Mr. Yohey have known, if he had reviewed the appropriate Policy Manuals, that he was not permitted to remove merchandise from a store without paying for it?
 {¶ 113} "A. [Burgess] He should, yes, he should have.
 {¶ 114} "* * *
 {¶ 115} "Q. Mr. Yohey was given the opportunity of resigning, correct?
 {¶ 116} "A. Yes."
 {¶ 117} In Shepard v. Griffin Services, Inc., Montgomery App. No. 19032, 2002-Ohio-2283, we touched upon the concept of comparators. We explained that "[i]n order to prove a prima facie case of discrimination in the terms and conditions of employment, [plaintiff] must demonstrate that individuals outside of her class who were treated more favorably were similarly situated in all relevant respects." Likewise, the same standard applies when determining whether an employee has shown mendacity for pretext purposes.
 {¶ 118} To be "similarly situated," the individual Hapner seeks to compare her treatment with "[m]ust have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ercegovich v. Goodyear Tire Rubber Co. (6th Cir. 1998),154 F.3d 344.
 {¶ 119} We conclude that Hapner has failed to establish that she was similarly situated to Yohey or Cope. Yohey was an assistant manager. But Hapner was a manager. The two were subject to differing standards. As for Cope, although both he and Hapner were managers — they did not engage in the same conduct. We agree that both were subject to discharge. Nonetheless, Hapner was disciplined, not once, but twice, prior to discharge, for two major infractions. If anything, the deposition testimony of Burgess indicating that Cope would have been fired if he had not resigned suggests that TM treated men more harshly than women. Thus, TM's treatment of these two male employees does not prove evidence of mendacity on its part. But even assuming for summary judgment purposes that TM's having allowed the two men to resign evidences bad faith on TM's part, it is not enough to save Hapner's claims under the circumstances of this case.
 {¶ 120} As the United States Supreme Court foresaw, there will be discrimination cases where an employee may make a weak showing that the employer's proffered reason is false but still fail to convince a reasonable juror that she suffered an adverse employment action because of her sex, due to strong evidence that no discrimination occurred. That is the case here. Although Hapner offered some weak evidence of pretext, she failed to create a genuine issue of material fact that her gender was the real reason for the adverse employment action. Here it is undisputed that Hapner failed to properly lock her safe and failed to count an entire trailer of inventory under her control. The inference that these two actions are not enough to motivate TM to discharge her is weak, at best. Evidence that she was disciplined weeks after the fact or that two male employees were allowed to resign instead of being terminated, under substantially different circumstances, is not adequate proof of sex discrimination under these circumstances. We conclude that Hapner did not put forward sufficient evidence to support a reasonable inference that TM's proffered legitimate, nondiscriminatory grounds for her discharge was but a pretext for gender discrimination. Although Hapner, as the respondent to a motion for summary judgment, is entitled to the benefit of all reasonable inferences, those inferences must be reasonable.
 {¶ 121} Often, when an employer discharges an employee for a legitimate, non-discriminatory reason based upon the employee's conduct, the conduct upon which the discharge is predicated is subject to a factual dispute. The employee claims that he didn't do the act, or that he had a legitimate reason for doing the act, and the employer chooses to disbelieve the employee. In cases where the conduct upon which a discharge is predicated is subject to factual dispute, merely persuading the finder of fact that the facts are as claimed by the employee, without more, is not sufficient to establish a claim of unlawful discrimination, assuming that the discharged employee is within a legally protected class. Otherwise, every time a member of a protected class were discharged, that discharged employee could obtain judicial review of the grounds for his discharge. That is not the intent of laws prohibiting discrimination in employment. An employer may make a reasonable factual conclusion concerning an employee's conduct, and the mere fact that a jury might reach a different factual conclusion, without more, is not sufficient to make out a claim of unlawful employment discrimination. It is only when the employer's conclusion of fact is so unreasonable that it independently supports an inference of discrimination, or when an employer's conclusion of fact with which a jury subsequently disagrees, together with other evidence, supports a finding of discrimination, that a jury may reasonably find that the employer's proffered legitimate grounds for the adverse action is a pretext for unlawful discrimination. That is consistent with our understanding of Reeves, supra.
 {¶ 122} After reviewing the evidence and all reasonable inferences arising therefrom in a light most favorable to Hapner, her prima facie case and proffered evidence of pretext is insufficient to support a finding of gender discrimination. Accordingly, her second assignment of error, and part of her third assignment of error, as it relates to a violation of public policy under R.C. 4112 for gender discrimination, are overruled.
THE TRIAL COURT DID NOT ERR BY RENDERING SUMMARY JUDGMENT IN FAVOR OF TM ON HAPNER'S CLAIMS THAT SHE WAS WRONGFULLY DISCHARGED IN VIOLATION OF PUBLIC POLICY.
 {¶ 123} Hapner alternatively claims that she presented sufficient rebuttal evidence that her former employer's actions were wrongful because they violated public policy, including both discrimination based upon her gender and an implied covenant of good faith and fair dealing. As explained above, Hapner presented insufficient evidence to persuade a reasonable finder of fact that TM discriminated against her based upon her gender, so the trial court did not err by rendering summary judgment in favor of TM on this basis. We also reject Hapner's contentions regarding the trial court's failure to consider her claim that TM violated an implied covenant of good faith and fair dealing. The trial court resolved this case by expressly rendering summary judgment in favor of TM on Hapner's first and second claims, which implicitly rejected the second prong of her second claim. Although it might have been better practice for the trial court to have addressed the matter more fully, any procedural error in that regard is harmless, because we conclude that the trial court properly rendered summary judgment in favor of TM.
 {¶ 124} Hapner concedes that she is an at-will employee, who could normally be discharged for any reason, but she contends that she fits within an exception to the at-will rule because TM breached public policy contained within R.C. Chapter 4112 creating an implied duty of good faith and fair dealing in the employment context. She cites Wells v. OrmetCorp. (Mar. 17, 1999), Monroe App. No. 798 to support this proposition.
 {¶ 125} We disagree. We have held otherwise despite the reasoning advanced in Wells:
 {¶ 126} "The general rule in Ohio is that `unless otherwise agreed, either party to an oral agreement may terminate the employment relationship for any reason which is not contrary to law.' There is a strong presumption in favor of an at-will contract unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other. The Ohio Supreme Court has held, subject to the exceptions described, that the right of an employer to terminate an employee's employment for any cause at any time is absolute and cannot be limited by principles that protect persons from gross or reckless disregard of their rights, or from willful, wanton, or malicious acts done intentionally with insult, or in bad faith.
 {¶ 127} "* * *
 {¶ 128} "The Ohio Supreme Court has held that clear public policy warrants an exception to the employment at-will doctrine when an employee is disciplined for a reason which is prohibited by statute. Clear public policy sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly, but may also be discussed as a matter of law based on sources such as the U.S. and Ohio Constitutions, administrator rules and regulations, and the common law.
 {¶ 129} "Some courts have attacked the perceived inequities of the employment at will doctrine by creating a `malice and bad faith' exception sounding in tort or `an implied covenant of good faith and fair dealing' sounding in contract and/or tort. Ohio courts have not yet gonethat far." Criner v. Urologic Physicians Surgeons, Inc. (Dec. 15, 2000), Greene App. No. 2000-CA-28 (internal citations omitted; emphasis added)
 {¶ 130} Because Hapner has failed to articulate any recognized policy exempting her from the at-will doctrine, TM could discharge her for any reason. Accordingly, the trial court did not err by rendering summary judgment in favor of TM on Hapner's wrongful termination claims.
 {¶ 131} Hapner's first and third assignments of error are overruled.
 III {¶ 132} All of Hapner's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF and YOUNG, JJ. concur.